2012-5106 Kellogg Brown & Root Services v. United States 2012-5106 v. United States 2012-5106 v. United States 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 2012-5106 The second error which I think the court made apart from this whole standard review. Let me ask you a question about this. Regarding common law fraud, suppose we show, we hold that the government has shown a causal link between the fraud and the award of the TAMIMI subcontract. Do you have any argument remaining if that causal link exists? I've got an obverse question on that for the government. I don't have a heart attack yet. Yeah. You know, the thing is that that is essentially the, that is I think the core of our argument is that there isn't a causal link and that the court found, you know, the court found that there was no evidence at all or rather that the evidence indicated that it would have been the same regardless both with respect to Work Release 3 or the Anaconda subcontract and the Master Agreement 3. The second overarching legal argument, legal error that the court made was although it agreed that you have to consider the circumstances of a decision and determine whether it was reasonable, it immediately added a caveat to that which I think robbed it of any value by saying that KBR would be subject to what it called kind of a conference from contracting rather than considering the actual difficult wartime circumstances unless KBR had no control over those circumstances. And we believe that that was fundamentally mistaken because it's contrary to the idea that you judge the reasonableness of the decision ex ante based on the fact that they faced the time. And if they make a decision that is reasonable at the time and it turns out not to have worked, that it can still be a reasonable decision. And in this case, the court didn't identify anything we did wrong on the self-performance and it was the self-performance that she said rendered us weak and thus rendered our negotiating position weak and thus undermined our ability to negotiate what she would have thought would be a more reasonable contract. The only thing she identified that went wrong was the fact that because of the rising tide of violence in Iraq, which the army didn't anticipate and I don't think we should be on the hook for it because of that, other countries wouldn't let their employees, wouldn't let their citizens come and work for KBR and performing that was the only issue that the court identified. And if that is it, I don't think there can be any basis for saying that we were somehow at fault and you can hold us, you could say that we controlled that and that we should therefore be on the hook for that decision. And I think this is a very, I think that's a very fundamental flaw. A government contract, it couldn't proceed like that if you have, you know, people designing weapons systems and everybody thinks the stealth technology is going to work, but it doesn't work in the end. They shouldn't be on the hook for all those costs because they exercise some sort of control over them. That has never been the law and I don't think it should be the law here. I'm trying to understand how the audit fits in with this. Tamimi was paid by KBR as they went along, is that right? Yes, Tamimi was paid by KBR as we went along. And were there any audits or interventions by the auditor, the defense department during? Yes, there were audits along the way. There were audits for various other events. There was a settlement that occurred here covering the first part of KBR's contracting in Iraq and the first part of Tamimi's contracting in Iraq that was part of the DCAA settlement, which settled everything up for the June crisis and we began here with July. Did they ever say that Tamimi should not be continued as a contractor? No, they never did. Charging, overcharging? No, well, they never said that Tamimi shouldn't be continued as a contractor. Tamimi was the government's favorite contractor. The Corporal Lowe made a finding to that fact that the Army was quite fond of Tamimi. They contracted directly with him. They, at one point, considered contracting with Tamimi throughout Iraq. I'm looking at the CFR defining reasonableness of cost. If it does not exceed that which would be incurred by a prudent person in the conduct of competitive business, and I see page after page where the court analyzes Ms. Hayes' negotiation. It was not conducted reasonably. She wasn't knowledgeable. She wasn't informed. Why aren't those fact findings that we have to accept as not being clearly wrong? Because she applied the wrong standard. The wrong standard of prudent person in the conduct of competitive business, and so much of what the trial court says does not sound like the conduct of a prudent business person. Two things. First of all, when it comes to arms-length negotiations, if you look at what Professor Nash said specifically about this case, an unaffiliated expert, he said that when it comes to arms-length negotiations— We're reviewing the claims court decision, not Professor Nash's views. But, I mean, it's his understanding of what the law is in this area, and he says that it's essentially a binary decision. What authority is that? The Teledyne case, I mean, admittedly it is not binding on this court, but the court has said we give it great respect. But there's like the Teledyne case from the Armed Services Board of Contract Appeals. No, what authority is Professor Nash? I mean, yeah, he writes a newsletter. Well, he has been practicing in this area for 50 years. This court has repeatedly cited him as authoritative. We cite a couple of examples in our reply brief. And the point is that when you just look to see whether there are arms-length negotiations, the FAR doesn't require you to go behind them. And, in fact, Professor Nash and the case law says you don't. My recollection of what he said isn't that it was wrong. He said this is a problem. No, he said he is unaware of any case, and, I mean, he's been doing this for 50 years, where anyone has ever looked behind and determined that the contractor could have done a better job. And if you look at all of the cases that cite this provision, they don't do that. They just look to see whether or not there was arms-length negotiation. FAR doesn't require more than that. Now, to return to this question about the prudent person standard, that is the language that was in there in 1960 when this regulation was first adopted. And it was interpreted at the time, it was interpreted before that time, as meaning that we will not basically, because contractors, these are reserved, cost reimbursement contracts are reserved for situations where the risks are very great, the requirements are very difficult, and the profit margins are very thin. And because of that, and the government doesn't even dispute this, ordinarily they say most of the risk falls on the government. But all of the case law says virtually all risk falls on the government in these instances. And you simply can't have the contractors, when they're making so little money on these contracts, which are 1% and 2% contracts, when you're making so little money on them, those kickbacks were for the employee's own good. KBR didn't get any of that money, or we wouldn't be here. But they simply can't afford to then not be paid for things which they actually paid out for services the government was more than happy with. Does this include my rebuttal time? I don't see my yellow light, if it does. Oh, really? Okay. Well, in that case, better reserve the right of my time for rebuttal. We'll save your rebuttal time. Let's hear from the government. Mr. Crowder. May it please the Court, and good morning. Everything that KBR has done to advance its case is permitted to fund a subcontract with Tamimi. Without that contract, there is no entitlement to payment upon the invoices, and it cannot establish a claim. But the Court's factual findings demand a determination that that subcontract was birthed in fraud and corruption. Mr. Prouty, let me take you over to my common law question that I asked your opposing counsel. And it seems to me that what you're saying is that given the claims court's finding of facts which could support a common law fraud finding, such as that KBR employees received kickbacks, that their receiving them played a significant role in the award of the Tamimi subcontract, including intervening with other KBR employees, that common law fraud shouldn't lie. And that's your argument, and indeed the claims court makes those findings. But it seems that you don't dispute the claims court's overall finding, which is that notwithstanding the fraud at issue, the contracts still would have been awarded to Tamimi. Do you or don't you? Well, I don't argue that the Court's factual findings are not erroneous. I don't argue they're erroneous. They're clearly erroneous. What I do say, though, is that those factual findings, which you said, for example, there's no taint on the contract, were premised upon a misreading of the law. For example, is it possible that Tamimi might have gotten the contracts? We have always said that it's possible. We've always said that. But there's a line in the record that says that the authorities, whoever they were overseeing all this, pressed Tamimi as a favored subcontract. The line of the record is that at some point, and it's based upon some testimony from actually Mr. Hall, some of the Army people talked about how they'd like Tamimi. However, for example, Mr. Petchy, who was the subcontract administrator at KBR, was going to give the contract at Camp Anaconda to TES, the event source, another contractor. In fact, he called and said, you're on your way to Kirkuk for the C6 tasking. The C6 tasking has been moved to Anaconda. Drive to Anaconda instead. And when he did that, Terry Hall, recipient of thousands and thousands of dollars from Tamimi, stormed into his office and demanded he change things. And he did so in a way that Mr. Petchy described as violence and in a way that, frankly, he said he couldn't understand. But nevertheless, as Mr. Petchy testified, because what Mr. Hall wants, Mr. Gatlin wants, who is the head of operations in all of Iraq and Kuwait, and what Mr. Gatlin wants, you better give, he relented. That was the finding of the trial court. Now, the trial court's findings about it would have gone to Tamimi anyway, where essentially the government hasn't proved it wouldn't have gone to Tamimi anyway, because we can't. It's impossible to prove how the toothpaste would have gone out of the tube in a different direction. What we can say, though, is there's a causal link because the individuals who made the decision-making were corrupted. They were receiving money and other favors from Tamimi, and they were the ones that, one, in the first instance, found them technically acceptable to do work on the Nasser agreement. Two, managed all the operations. Do I hear you saying that because KBR didn't find their dishonest employees soon enough, therefore KBR has to absorb the cost of feeding the army for all this period? I'm saying that KBR is its employees. KBR is responsible for the actions. These are not just employees in the sense of a janitor or somebody feeding somebody. These were their managers who KBR gave responsibility for managing over a billion dollars of DPAC contracts in Iraq. KBR is the one that tabbed in the responsibility of these individuals and said, Paul and Holmes, you are the top operational people for over a billion dollars in contracting for feeding the troops in Iraq and Kuwait. You have this responsibility. You get to make all kinds of decisions about scope of work, about how it's making essence about the costs, making technical determinations about who's qualified, the kinds of things that could steer contracts with people. KBR put these individuals in that place. And the Supreme Court said in that process, it doesn't matter if they are technically officers of the corporation or not when it comes to kickbacks. Don't want to interrupt you, but I hear you saying that, yes, KBR has to bear the entire brunt of the cost of this contract, no matter what value may have been received because they had dishonest employees. Just as the Supreme Court said in Mississippi Valley, even if a person, even if a company is ostensibly innocent of wrongdoing, even if it didn't know, if it has people there, the public interest, the good government interest, and having contracts that are free from corruption and are free from these things. So KBR paid, I mean, shouldn't KBR at least receive the value of the goods that were provided? Now, that is a question, of course, about whether or not quantum merit, for example, might be an offset or things of that nature on the common law fraud. Now, K&R Engineering says that it's basically going to have an issue and you can't just reach back. I will admit there is, of course, some quantum ballot arguments from Crocker back in 1916 from the Supreme Court that might argue otherwise. But the question about whether or not there's common law fraud and whether or not this contract is going to have an issue, KBR selected these individuals and put them in a place of responsibility. Their boss, Mr. Gatlin, himself was getting alcohol, liquor from Tamimi, and was aware of at least some of the things going on with Mr. Hall and Mr. Holmes. Certainly knew that Tamimi was sending them off on a junket to the UAE at that point. And it was just fine. KBR got out, buried its head in the sand when these individuals were given responsibility by KBR. Again, the Supreme Court spent a very clear enacting process in the kickback context, made it very clear Mississippi Valley. This court made it very clear. There's no dispute that these employees were dishonest. Indeed. That they received kickbacks, substantial kickbacks. But what I find troubling is now who is to, when there was value received, Tamimi's been paid. They were told overcharged. And we accept that. Even though, again, the record shows that there were a lot of other people who urged that they be in this position. Perhaps there was a shortage of local purveyors. But I don't see anywhere where it says that a good deal of what KBR paid Tamimi was not for the food which was served at Anaconda and anywhere else. As a matter of minor factual correction here, actually the food itself was provided by the military. The people who actually cooked the food were the Tamimi employees. However, one thing to note is the DCAA audit, which kicked off this issue, found that Tamimi was essentially being paid approximately three times the average cost per person per meal. But where was the DCAA, where were the auditors throughout all of this? You wait until it's all over, the subcontractor's being paid, so there's no opportunity for any, somehow, equalization. And the energy that had the crooked employees for $20,000 or $30,000, now we're hitting for however million is left, about $30 million, I guess. Your Honor, first of all, the touchstone for the case is not the amount that it took to corrupt KBR. KBR is virtually cheap, but that doesn't mean that therefore the government, because there's only $38,000, should be able to hire a person. Mr. Prouty, am I correct in my understanding that the government is conceding that if KBR can show that certain amounts were paid out and were legitimate payments, that it's entitled to quantum merit? I'm not saying that yet, Your Honor, and I don't want to be dodgy about this, but I'll say that it was never briefed below, and it was really not early before the court. Crocker suggests, with Crocker and Balibar back in 1916, KNAIR suggests any payment upon a corrupted contract like this, you get all the money back. They're intentions. Certainly the government's position is that we should not have to pay any money on a corrupted contract. However, I will admit that there is some law that goes either way. For the purposes that we have here today, there's common law fraud. Certainly it's very clear that the circumstances meet that test. If we found common law fraud and sent it back down and said that you have to look at quantum merit, would the government's position be no, they've waived that? As far as waiver, no, Your Honor. I would say that there was a motion to dismiss on very clear grounds, and quantum merit was not before the trial court. So we would not punish KBR, and certainly the trial court would not either, for failing to raise quantum merit at some point. Again, I would suggest the law is very clear. KNAIR engineering says you don't use quantum merit. Amdahl from this court, although sort of having quantum merit at one point suggested it for fraud cases, it's a different story. I think the balance of law is on the government's side, but that has never been presented in the trial court that's not presented here. What is presented here is individuals who have material roles in the contract award, both in finding that Kamini was a technically qualified contractor, and in a statement of work determinations, and in determinations of overriding Mr. Pecci's initial inclination. Keeping them on the job. Keeping them on the job. So when they discovered the kickbacks, they fired the people. No, Your Honor. And yet you're still hitting them for the entire, everything that they paid out. No, Your Honor. They were not fired for their kickbacks. The kickbacks were only discovered in 2009, when Mr. Hall was being prosecuted for another matter, and in December of that year, I believe it was, he divulged the kickbacks from government prosecutors when they were seeking to have a plea bargain on a different matter. So what does a contractor do? How do you discover that you may have fraudulent employees at the risk of the entire contract? I suppose what you get is a cash in advance and a whole bunch of other increased costs. Well, Your Honor, there has always been a requirement for decades and decades and decades that contractors are responsible for who they hire. It's a hiring decision. If you hire somebody who does a very bad job in your contract, and you get terminated for default, that is your fault because you hired the people. The corporation paid a penalty for these kickbacks to its employees, right? Your Honor, as a result of the trial, the court found that it should get basically – $35,000, $38,000. $38,000, Your Honor, yes. A very small penalty for the damage that was done. But that was not – there was no fraud in the making of the contract, was there? In the making of the TAMIMI subcontract or the original law cap contract, Your Honor? The law cap contract, no. The TAMIMI contract, totally fraudulent because the individual involved were taking kickbacks. And there would never have been – it took Terry Hall saying it was okay for TAMIMI to get the contract technically for it to get a master agreement. He had veto power. Now, is it possible that they would have done it anyway? Certainly. But if we were to bid protest and the head of the source selection evaluation board technically qualified people and he was on the end of a kickback, we would have no doubt and no problem kicking that back and say, no, that is an invalid award. It's the exact same thing here. And a final thing, Your Honor. Judge Newman, you expressed a concern about what is a company to do. It should keep an eye on the costs. And if it sees that TAMIMI is extraordinarily expensive compared to the other subcontractors as there was evidence of the contract. There's something very strange. Here we have the Army saying we want you to deal with TAMIMI even when there are other bidders on these contracts. Here we have situations that, according to some people, money always seems to be changing hands as far as subcontractors are concerned. So now, eventually, it was discovered there was $38,000 in kickbacks to two employees. Therefore, we're not going to pay you the $40 million that you, we're not going to reimburse the $40 million that you paid to the subcontractor that we urged you to take, even though that subcontractor, in wartime, with all of the consequences, the pressures, perhaps, to use local subcontractors in these circumstances. I don't know what else. All of the things that are on the record that explain how we got to this situation. And nonetheless, the prime contractor, who had a couple of dishonest employees, it's going to cost them $40 million because these employees got $38,000 in some kind of goods or services or vacation. So the things that apparently was done with that money. It was cash in envelopes for the most part, Your Honor. And beyond that, the $40 million was not withheld by the Army because of the kickbacks. The Army didn't know about the kickbacks at the time it withheld the $40 million. Well, that's really hard to understand why it was withheld in all of the circumstances of this wartime situation. In Iraq, there's the bidding, the pressures, the uncertainties, the dangers. But to say we're not going to compensate any of it. The government did compensate, KBR, Your Honor. The government compensated the amount that it found appropriate for that six-month period of time that was accepted in this lawsuit. It found that it was paying per person per day at the largest diet facility, which arguably should have been the cheapest one, almost triple what others were. And that was why the DCA withheld the money. When KBR challenged it in the court, they put out three bases for saying it was a reasonable cost. Where was the Army and their auditors through all of this where now we determine that they were charged too much because it was $23 a meal when it should have been something else? Well, the auditors were working very, very hard. Obviously, it was a war zone as well. But the persons with the most – KBR had the responsibility under a law cap contract to keep its prices reasonable. It was KBR who had the first initial responsibility. It was KBR that recognized through the summer of 2004 that its prices were unreasonable. Where were the auditors through all this? This is something that could very well have been discovered if there were cause on the ground at the time in light of all of the circumstances for saying that you're paying this subcontracted too much. The auditors were questioning things, Your Honor, and let's be very clear. KBR questioned the cost itself. They knew there was a problem, and internally they recognized there was a problem. And that's why Vice President Walter, for example, said we can't pay this because it's too much. The auditors were there, Your Honor. Now, the auditors did their more finished audit reports subsequently to the conclusion of the contract basically because of the Lawrence-backed law. And, of course, because they wanted to do it right and because they wanted to examine the information that KBR provided to them after the fact. But they were there, Your Honor. And KBR knew itself, however, this money was way too much. And I see I've gone way over my time. All right. Any more questions? No questions? Okay. Thank you, Mr. Prouty. Thank you, Your Honor. Mr. Elwood? Mr. Elwood. Mr. Prouty made a number of factual assertions which are, I think, inconsistent with the record. For starters, he kept mentioning this argument that government auditors said KBR paid triple for this facility when it paid elsewhere. The district court, rather the trial court, found that figure deficient. She says it discussed it on page JA-76. And she found KBR's explanation more persuasive. There were facilities in there that weren't even operating in this time period. That is, the DCA auditors compared this facility to, I think, a list of like 12 facilities. And there were some on there that weren't even operating at the time. There were some on there that didn't have overhead costs that needed to be amortized, things like that. They found the government, or rather KBR's example, to be more persuasive. Secondly, he argues that there was some sort of finding that Mr. Apache changed his mind as a result of Mr. Hall's arguing. There was no such finding. You can look through the opinion. She found in no uncertain terms that the Hall and Holmes involvement had no effect on giving the master agreement or on the work release. On the master agreement, their only job was to say whether they were technically qualified. And everybody knew that they were technically qualified. They were already performing at this very airbase at the time. With respect to the causation, what he doesn't tell you is that Jim Spohr, who was the regional manager for KBR for the northern region of Iraq, he was the one who had the idea of switching the Kirkuk contract to, when it was switched from Kirkuk to Anaconda, that it be given to Temimi. It was his idea. And the judge below found that she credited testimony of Bill Jonas that it would have been irresponsible to give it to anybody else. When KBR is ramping up to feed so many people in such a short period of time, and you have so many moving parts, you're feeding 200,000 people in an area the size of California, you can't be switching out people who are performing well already on that site, as Temimi was at Anaconda, to do something else. I think it's very telling if you look at, you know, they talk about how important Hall was. But it's undisputed that the Kirkuk contract was given to the event source instead of Temimi at a time when Hall was supposedly was getting kickbacks. That contract was given to the event source rather than Temimi at Kirkuk, the one that was eventually switched to Anaconda. So that's one area already where Hall, you know, he actually recommended the event source there, not Temimi at a time he was taking kickbacks. But secondly, there was another contract that was led at the time for a Baghdad base. So what does the fact that he recommended that one mean? Well, in any event... Other than that he wasn't doing his full job for the... Well, maybe that's true, but I mean the fact of the matter is that at a time when Temimi was supposed to be getting favored, the event source got that one. The second one at Baghdad where Hall was advocating Temimi, it went to the event source again. And at Camp Arabjan where Hall advocated certain action, they rejected it. So the court below found that he was a mid-level employee and that it would have been irresponsible to give the Temimi subcontract... Or I'm sorry, the Anaconda subcontract to somebody else. And there's... And Mr. Crowdy has given you no reason in the record to second guess the judge's findings in this score. She applied the godly case conscientiously. And I don't think there's any basis for finding that it was clear error. In addition, he suggested that Hall's supervisor was aware of the kickbacks going on. And the judge, the court below, explicitly found that there was no reason for him to believe that. He was unaware of the kickbacks that were going on. And that is in the opinion. One other thing that I think is noteworthy when you were talking to Mr. Crowdy about the DCAA auditors. The DCAA auditors, when all of this happened, KBR paid a settlement to basically true up things at all these airbases up until June 30th. And at the end of all that, the DCAA auditors found the rates for being paid on June 30th to be reasonable. And those fee... If you look in the records, that is exactly the same amount that was being paid on July 1st, which is part of the beginning of the period that is being contested. So again, we have the attention of the DCAA auditors. And there's every indication that they thought that these rates were decent. Finally, I think one thing that is important to keep in mind is that there's no dispute that KBR had a zero tolerance policy for kickbacks. Mr. Petsche was actually fired for soliciting a kickback. And so it's clear to everybody, we took this very seriously and we did everything we could about it. But what the government is arguing for here is that years after receiving really excellent services, that they can just because of two minor people where the court below has found no effect on the contracting, that they can go in and basically blow up literally hundreds of millions of dollars contract. And we would have to go back and negotiate for quantum merit at best. I think that that is an extremely hazardous position. I mean, it's hard to believe that the government would be able to contract well with military contractors when they face that kind of risk, not only on the cost reasonableness front, but on having contractors blow up when somebody who are found mid-level managers that the court below found the effects of it incidental, that they could lose the benefit of literally or rather they could lose and have to fund for hundreds of millions of dollars this far after the fact. It's just not a recipe for happy government contracting. Thank you. Thank you, Mr. Ellwood. And thank you, Mr. Prouty. The case is taken into submission.